Good morning, your honors. My name is Michael Reese. I am counsel for the petitioner, Mr. Eduardo Larin, who is actually here in the audience today, sitting in the back row. We are asking the court to reverse the decision of the district court that dismissed Mr. Larin's complaint. It's a very interesting decision because the court found that the complaint had sufficiently pled under Rule 9b, the heightened pleading standard, for fraud claims. And then the court dismissed the case, substituting its own beliefs and experiences for that of the plaintiff and other consumers, to rule as a matter of law that no reasonable consumer would be misled. I think this goes to a broader issue, and the first hearing, for your honors, we were talking about the works of Fatty Arbuckle. So let me ask you a question. He deposited a check for $7,500? Correct. $516.06. So where'd that money come from? That came from, I guess you'd call it a business venture out of Texas, and that check did not clear, or it bounced. What kind of business venture? Was that a pool game or, you know, gambling? No, it was not. Mr. Larin, my understanding, is in physical therapy, massage therapy, and it had to do with that, equipment involving that. So, Mr. Larin... He got $7,500 for massage equipment? Correct. All right. So they sold it down in Texas? The company was... He's located in San Diego, but the company he's dealing with was in Texas.  My understanding is that the transaction did not go through because that check ultimately bounced. So what happened? He still has his equipment? I don't know if he still has it today, because this transaction took place in 2006, but I don't know the answer to that, Your Honor. Long story short, though, the money that he received was deposited in the bank. And then he took out $6,420. Correct. Two days later. That's correct, Your Honor. Where is that money? My understanding is that also went towards equipment dealing with his business. But it was discretionary in that he didn't have to spend that money at that time. And if he had known that the check that he deposited would bounce, was for insufficient funds, he wouldn't have made that transaction. And that's why he felt misled by the bank's practices here. He thought that by entering this program, which was labeled as a program giving him protection, that he would be in a better position than if he didn't have this. And that's actually the opposite of what happened. If he had never enrolled in this program, he would not have been able to draw on that check for $7,500. And in that type of situation, he would never have been able to write checks to others, which means he wouldn't have incurred all these costs, which totaled, I believe, in the end, about $2,100. But wasn't that based in part on the fact that it took him three years to pay off the credit card balance? That is correct, Your Honor. There are basically three separate areas. That couldn't have come as a surprise to him because we all know that these banks charge a huge rate of interest on credit card balances. Correct. The interest rate came at 23.99%. Which on $6,420 over a three-year period adds up to a pretty hefty interest charge. That's correct, Your Honor. And he knew, did he not, when he set up the account that it was the credit card that was essentially backing any overdrafts on his bank account? That's correct, Your Honor. So I guess I'm having a hard time understanding what it was that he was misled about based on the statements that are in the record from the Internet advertising and whatever else the bank was saying. The way that the, it's the uncollected funds program. And so he was expecting to be treated at least no worse and better than all other bank customers who didn't have the overdraft protections. Well, what he avoided, as I understand it, was whatever B of A would have charged had he not had the protection for simply an insufficient check deposited in the account. I couldn't tell from the record. Do you know what that amount is? I'm sorry, could you ask? Do you know what the amount is that the bank would have charged had he not had the protection? I believe, I don't know that amount, but I know there's something. Understand that if I deposit a check in the bank and it doesn't clear for some reason and it gets returned to me, they're going to charge me something. That's correct. $5, it might be $35, I don't know what the charge is, but. That's correct. And I know from other litigation issues. And they send that information to a credit card reporting outfit, I mean to a credit reporting organization. For credit scores? Yeah. Like FICO? Yeah. Correct. So if you, and one of the representations that issue here is that this. And if you do that, if they do that, it takes a long time to straighten that out. That's correct, Your Honor. What you're really getting is you deal with a bank and they see where they can make more money, so they offer this service. And the benefit you get is that if a check comes in and you're short, they pay it. And they call you and let you know that they've covered the check, but they let you know you're short. And they're not really looking for, well maybe with a credit card backing it. Was it the bank's credit card? Yes, Your Honor. It was a Bank of America credit card. So they, yeah, they back it with their own credit card. And that's where they make some money on it. But they let you know so you can always come in and clear it up. The important thing to think about, there's two different scenarios. And the scenario where, let's say you have no money in your bank account, just zero. You haven't put your paychecks in. And you go and you write somebody a check for $1,000. With insufficient funds to cover it. With insufficient funds to cover it. So if you had not been a member of this program, you would overdraft it on your account and it would charge you, I think, $35. It may be something more or something less. If you do have this account, this overdraft protection, then what it does is when you overdraw, it pulls the money from your credit card. Or it could, if you had a separate savings account or a separate account with the bank, you could link it to that so the money came out of there. That's correct. Some other source of money, either credit card, bank account, I think there would even be a line of credit. Right. But if it was a separate account, he wouldn't have incurred the interest charges on the $6,420. That's right. There still would have been other charges, though, because of transfer fees, service fees. But some of those, because of this protection program, my understanding is that some of those charges are waived if you sign up for the protection plan. Well, the issue here is there's a $144 transfer fee. That certainly wasn't waived. That was assessed. Transfer fee from the cash advance, right, for the $6,420, which is what, I mean, if I give B of A, go to a cash machine and I stick my Visa card in there, it's going to charge me a cash advance fee that is based on the amount of money I withdraw, right? From your credit card. And so the $144 came from the $6,420 cash advance. That's correct. So that couldn't have been a surprise to him. Well, here's where the surprise comes. So that first scenario I just laid out, and I think it's important, that's not this scenario. And we're talking about, you know, the courts administer justice. That person is a very unsympathetic plaintiff because that person knew they had no money in their account and went ahead and wrote somebody a check. And just because they had this protection that the bank offered, they were somehow covered. This is a completely different scenario. What happened here is — My problem with your case, counsel, is that your whole theory of the case still has to be linked to a misrepresentation or misrepresentations made by the bank. Right? That's the first hurdle. You've got to show that there was a misrepresentation. And that misrepresentation can't rely on ones that have qualifying language like we usually do this or we can do this. So part of the allegations and the complaint, the funds available policy of Bank of America is that the funds will be available the next business day. So even if he wasn't enrolled in the ODP program, there is a disclosure that funds will be available the next day. So I don't know how that links in with your theory of the case. Well, actually, I think I know exactly what you're talking about, Your Honor. That's on page 34 of the bank's agreement. On page 35, though, the bank says, under certain circumstances, we will hold the money and not give it to you. We'll give you $100 of that $7,500 that you put the check in from somebody else, but then we'll hold the rest of it up to seven days. And that's to make sure that the money is actually good. And this is scenario two, which is my client's plight here. Is that if he had not been in the overdraft protection program, he would not have been able to have drawn on that $7,500 until the bank had assured that it was actually good money. Well, the linkage is missing, though. The bank says, under some circumstances, we'd hold it, right? And so he's saying, well, if I hadn't enrolled in ODP, they would have held it and I wouldn't have been able to draw it out. I don't know that I can infer that from the allegations in the complaint. Even generously construed to your client's benefit. The statements made by the bank may be actually true, but the laws that are at issue here, which are consumer protection laws, which Your Honor wrote about at length in the Williams v. Gerber matter, don't just go to address statements that are factually just actually false. They go to also misleading, actually misleading, which I think is what you're pointing out, Judge Nguyen, or have a capacity or likelihood or tendency to deceive or confuse the public. That's from the Williams v. Gerber decision. But the problem in Judge Perkinson's opinion dealing with the Gerber fruit treats was that the statements were actually false. That there really wasn't juice from all of the berries that were shown on the label of the baby food drink. Here, I'm having the same problem Judge Nguyen is having. I'm looking at what the bank said and I'm trying to figure out, well, if they're actually true, then this isn't like the Gerber baby food case. This is, at best, your client misunderstood, but the question that we have to ask is whether a reasonable consumer would have understood that the bank was promising that every time you enroll in this program, we're going to make you whole and you'll be better off for having been in this program than if you'd not signed up for it. And I think that is the very issue here and whether or not that's an issue for a trier of fact or for the court. Every reasonable consumer who has a bank account understands that if you deposit a check that someone else writes you, particularly if it's a check written on a Texas bank, and I don't know whether it was or not, but a big check for $7,500, you're taking a risk that that check might not clear. I mean, the author of the check might stop payment on it after the check is delivered to you. But once it actually shows up in your account, and that's the way my bank deals with it, which is Citibank, is they will not make the funds available to me until they've actually made sure those funds are for real. And this different situation here is the money showed up in Mr. Loren's account. It was available to him. He assumed, well, if it's in the account, therefore it's actually real money that I can draw down upon, and it wasn't because he was treated differently. He wasn't protected. He's treated differently because he has a backup. He's got, in this case, his credit card that will cover an insufficient return check. And in your first hypothetical, there's no backup at all. If that $7,500 check bounces because you started spending money before the bank tells you that the check has cleared and the funds are now available, the risk is on you, assuming that the bank advanced you to the fund. But if you're not in the bank's program, if you don't receive this protection, you actually receive more protection because the bank is making sure that money is actually available to you, making sure it's real money. But he wouldn't have been able to spend it two days after the check was deposited. I mean, is your theory, I was wrong here, you know, sort of on a theory of help me before I spend it myself when I shouldn't spend it? That's correct. So the bank is sort of in a parents-patrie relationship with its depositors? Well, when it says we're going to protect you if you sign up for this program, yes, it shouldn't strip you of any procedures that you would have if you didn't have the program. You should be basically getting the same thing as a normal... It did protect him from some things, which was, I thought you told us, which was a charge that would otherwise have been levied against his account when the check bounced. Right, and that charge, I think, would have been about $35, and instead what the bank did here is they made off with over $2,000 in fees. Well, they made off with over $2,000 because he took three years to pay it back, and it was bearing interest at the rate of 24%. That may seem hard to believe to us here, but I think Mr. Lorin is much more typical of the average consumer than members of the bench or lawyers because people like... The typical consumer, I think, lives paycheck to paycheck. It is hard to pay off a large sum of money. So when you see money in the bank and you draw down it thinking it's there and then you find out it's not, it's hard. It's hard to pay that back. And even if we put the $2,000 in interest aside, there was a $144 transfer fee, which was three times the amount. The bank really made off. But had he gone to a cash machine or to the bank and gave them his credit card and said, I'd like to withdraw $6,420 on my credit card, they would have charged him a cash advance fee, would they not? I understand that they would, but I don't think he would have done that. It would have been $144 based on the amount of cash that he was taking. That's correct. It's 3%. So I'm getting back to Judge Nguyen's question. Where are the actionable statements that the bank made that are false and therefore give rise to a cause of action? And they're identified in the complaint, and they talk about how it will – the name itself, protection. In fact, it doesn't protect you from overdraft. It caused him to overdraft. They talk about how this can help you reduce – Wait a second. What caused him to overdraft? The fact that they made the money available to him sooner than they would have had he not had the protection? The fact that they made the money available to him without checking that it was real money, which they would have done had he not been in the overdraft protection program. How did they check that it wasn't real money? I think they make sure the money actually transfers from the other bank that the check is written on. So even though he benefited by having the funds made available to him sooner with the protection program, and there were certain fees that got waived because he was an enrollee in the program, the bank should still be liable for consumer fraud. Why? Well, if he had known that the money was actually not real money, if the bank had put him through the normal procedure, then he wouldn't have made those payments and it wouldn't have occurred those costs that he had to pay to the bank. I do agree with you for one thing. You know, these agreements, the way it's drafted, I don't know who actually reads the fine print of these agreements. The system is set up such that it favors the big guys and consumers like your client, who linked their overdraft protection to a credit card, I think is aware that if you're not able to pay the balance off, you're going to have to incur a lot of fees in an attempt to pay it off. And that's what happened here. The problem is Bank of America told him or told consumers through its agreement how it was going to work out. It's not favorable to consumers. That's certainly a factually true statement, but it's all laid out there in the agreement, the circumstances under which they would make funds available the next day and circumstances under which the bank may actually hold the funds. I think this discussion we're having underscores one important fact of the law, and that's whether a practice is deceptive, fraudulent, or unfair, generally a question of fact, which requires consideration and weighing of evidence from both sides. But the problem here is that he didn't read the fine print. Not that it was hidden from him, but he checked the box apparently on the computer screen that said I agree to be bound by all these terms and conditions, but he never read them because, as Judge Nguyen points out, had he read the fine print, all this would have been explained to him. Your Honor, I think this case is equivalent to the BAC02 in which there's this kind of pervasive message, and the banks are saying if you enter into this program, if you enter into this protection program, you will achieve a higher level of protection than you would otherwise, and that's actually not true. I thought the statement said that it will sometimes save you these extra fees. Not always, and in this case, this is one of the exceptions. That's correct, but does that have a capacity or likelihood to deceive? The bank is certainly implying wants people to sign up for this service because they want people to believe that this will give you more protection than if you didn't have it, and that is exactly the opposite of what happened here. So you can parse each word and say, well, this is actually true and that's actually true, but that's not what the standard is for the consumer protection laws. Well, the standard is reasonably likely to deceive, is it not? Correct. Well, you see this all arises because the lobbyists got the usury laws revoked. You know, we had usury laws. You could only charge, I think in California, maybe the maximum was 7% or 8%. Now they're gone. So you can charge whatever the traffic will bear, and if you're a little late with your credit card, then boom, the rate goes up. That's right, Your Honor. That's why the banks were trying to push both Mr. Levin and other consumers to believe that they were in a better position, that they were protected by doing this, and in fact the opposite is true because they were able to hit him with the 23.99% interest rate, which he would have completely avoided if they'd called the program something other than protection. If they'd called it uncollected funds program, I think all of us, if we heard that program or offered that, we would scratch our heads and think, what is this? I want to look deeper into what this is. But when they use terms like protection, that is likely to deceive. At the very least, it should get passed a motion to dismiss. It's a lost art of actually having these type of cases go to the trier of fact, and as Your Honor pointed out in the Williams case, it is the very rare occasion when the court should, on a motion to dismiss, determine what's in the mind of a reasonable consumer. And I'm thinking most of lawyers and counsel and judges aren't in the same position as Mr. Levin. Somebody who's living paycheck to paycheck, who is always faced with the risk of overdrawing an account, who's put in a different situation than any of us would be with the banks. And so I don't think it is the proper place for the courts to rule as a matter of law using the court's experience and the court's beliefs and maybe the court's banking practices with somebody like Mr. Levin, who's in a completely different situation than all of us because he lives paycheck to paycheck and he has to interpret things differently from the bank. That should be determined by a jury of his peers, who if I was picking the jury, would be people who are in the same type of banking situation and would include members of the bar because we're just in a different situation. That's why this is really not appropriate for motion to dismiss determination. It's not that rare occasion. It's not like Freeman where somebody says, oh, I got a piece of mail and I think I won a million bucks, give me my million dollars. This is completely different. This is really involving predatory banking practices that the best way to be addressed is to let these type of cases see the light of day, go to court, go to a jury, and let the jury determine it. If the jury determines that this is something that a reasonable consumer would not be misled by, so be it. But the law's part of actually having cases go to trial along these lines, and this is one that should. It should not be determined as a motion to dismiss. So your client's here today. Yes, Your Honor. He's... I see him. I see him back there. You can tell, you know, why it's true when the lawyer's up here arguing, but the only one that's going like this is the client. It's good to know that he wasn't going like this, hopefully. I think you're safe. There's a lot of testifying going on in the back of the courtroom. Well, welcome. Welcome to Pasadena, Los Angeles. I'd save some... Before the Bank of America started? No, Your Honor, I do not. The Bank of America was formed in San Francisco, oh, I'm just guessing, you know, probably around the time of the First World War. And the power behind it was a person by the name of A.P. Giannini. And when it was first formed, it was called the Bank of Italy. And then the name was changed sometimes in the 30s when Mussolini took power. And the kids would all get little banks, and you'd put your pennies in, and you'd go open up an account. Now, where's it headquartered now? I think it's in North Carolina. Charlotte. Charlotte. Where? Charlotte, Carolina. I said that, didn't I? You did? Yeah. Yeah. So we've had, when I first got on the federal court, we had one wonderful judge who was an office boy for A.P. Giannini, who said when Charlie Painter, another person I knew who worked for San Francisco, mentioned that he wasn't able to take advantage of all the deals that he saw. He said, Charlie, don't worry about that. There's always good deals around. All you need is the money to take care of it. Thank you, Your Honors. Thank you. How do you like our weather? Certainly beats New York weather. Yeah. With a stick. All right. Here comes Giannini. Good morning, Your Honors. Are you from North Carolina? No, I'm not, but I've been there. I'm from San Francisco, actually. Oh, okay. And I'm very familiar with the Bank of America building and A.P. Giannini Plaza. May it please the Court, Sharon Mayo on behalf of Bank of America. In this case, the bank did exactly what it said it would do. It made Mr. Loren's funds available to him in accordance with its stated general policy the next day, the next business day. It charged the plaintiff only those fees that it disclosed would be charged. And it charged back to his account the returned check that he had deposited, just as it disclosed it would to plaintiffs. It did. It charged the plaintiff no more or no less than any of the fees that were disclosed in the account agreement. No reasonable consumer is likely to be deceived under these circumstances or could be deceived under these circumstances. Now, plaintiffs' claim that he was treated differently than a customer without overdraft protection is refuted by the deposit agreement, which provides that the bank's general policy is to make the funds available the next business day. And if not, the bank will notify the customer. There's no allegation in the complaint that he was notified that there would be any hold on his account or that he was notified that the funds wouldn't be available to him until a few days later. I think he's trying to say that had he not signed up for overdraft protection, he would have fallen into the category that's laid out, the numerous categories that's laid out in the agreement under which Bank of America would have held the funds. Actually, the general policy as laid out in the deposit agreement applies to all customers, OVP customers or not. Right, right, but the agreement also discloses that under certain circumstances, Bank of America may hold the funds. Right, whether you're enrolled in overdraft protection or not. And that's a matter of federal law, federal banking law. It's the Expedited Funds Protection Act, which controls when funds will be made available to customers. And it requires the length of time, it prescribes the length of time that those funds may be held and what notifications may be made. So Mr. Lorin was provided with his funds, they were made available to him within one business day as they would have been to any Bank of America customer unless they were notified of a hold. But wouldn't it be the case, Ms. Mayo, that had he not signed up for the protection plan, a $7,500 check would have triggered notification to a customer without the plan that the funds were going to be held longer than a day or two? They would have looked at the customer's prior banking history and determined whether or not to place a hold. But if they were going to place a hold, they had to notify Mr. Lorin either at the bank as he deposited it or by mail the next business day. Let's take Mr. Lorin's average daily balance, is that what they look at? You would agree, would you not, that in the absence of the plan, such notice would have been issued? No, I would not agree with that. You would not agree? I would not agree with that. Because he had such a history of large deposits and withdrawals? That's just contrary to what Mr. Reese was representing to us. Well, there's nothing in the record on that, Your Honor. So you don't know? I do know because I checked. That was something that we analyzed, but there's nothing. What's the answer? The answer is that the funds were made available to him in accordance with the general policy and his account was in good standing and he would have had those. Even a $7,500 check? Yes. Okay. Maybe I'll have to switch to Bank of America. Maybe you should. Well, did he have a credit card with the bank at that time? He did have a credit card and it was his credit card that he had linked as the backup for his checking account, which would provide the overdraft protection. So if, again, as Judge Nguyen and Judge Tallman have noted, this case is limited to affirmative misrepresentations. This court, the last time it reviewed the case, determined that any claims regarding the way that the bank's overdraft protection program operates or any disclosures that plaintiff would like to have had are both expressly preempted. So we are limited to what misrepresentations are alleged. What's the benefit to the customer to have the plan? Well, in a way, Your Honor, it's very much like insurance. You sign up for a policy thinking that there might be a situation when, in the case of insurance, that you're going to get into an accident or there's going to be a fire or a theft of your house, but you don't know at the time whether or not you are going to be covered. You have to wait for events to occur to then go back and say,  The bank's disclosures, which, again, are... But then with insurance, you get money from the insurance company. Or not, if it's not a covered event. But the way here, when you sign up for overdraft protection, you don't know whether you're going to be put in a situation of receiving a $7,500 check that ultimately bounces, what checks you will have written against it, if you'd written your mortgage payment against it or your child's college tuition payment. The idea of the protection is to make sure that your credit... But you have protection as long as you have a credit card. Or have it linked to a line of credit or a savings account. Well, but if you get a credit card, you're told you have a line of credit of this or that. So let's say he didn't sign up for this, Mr. Moran. And he had this overdraft. And he didn't have the money to come out and make it good. Would it kick over to the credit card? Yes, if he had signed up for overdraft protection. No, no, if he didn't sign up. If he didn't sign up, no, it would not go over. The check would have... He would have been charged a returned deposit item for the bounced check. He would have been charged with insufficient funds for any withdrawal, for the $6,420 withdrawal for the $200 check that he also wrote against the account. And those checks would have bounced, and he would have suffered whatever consequences to his credit score. So... Well, he could have called up and said, I don't have the money now, just charge my credit card. I'm not certain if he could or couldn't have done that, Your Honor. There's nothing in the record on that. What he also could have done is called the bank and asked them if the check had cleared, certainly when he withdrew the $6,420 in cash. Well, he could also go to the bank with a check and ask them to call the bank on which the check is drawn, find out if there are funds in that account, and then I think there's a system where the bank that's going to... on which the check is drawn can put a hold on funds so the check clears when it gets there. He could have... For a fee, you know. Right. There are a number of things that the plaintiff could have done that would have avoided the situation. And it's simply... The bank operated in accordance with all of its disclosures and therefore cannot be found liable, and certainly not for any affirmative misrepresentation. All of the statements that the plaintiff cites in the complaint were qualified statements that it can protect you, it usually will result in lower fees. Unfortunately, this case is the exception in that circumstance where the fees turned out not to be lower. And again, a lot of that was because he took three years to pay off the... Maybe you ought to settle the case while they're here. We have tried to settle the case, Your Honor. So just to summarize, the essence of the plaintiff's claim is that the bank made available to him, sooner than he would have liked, $7,500 from the check that he deposited, and thus the bank somehow encouraged him to spend those funds before the check cleared, and therefore the bank is liable for all of the negative consequences. However, that is a complaint about funds availability, which is preempted by the National Bank Act and also foreclosed by this court's prior ruling in the case. There is no misrepresentation which is identified in the complaint that would be likely to deceive a reasonable consumer. None of those statements and the fact that the plaintiff enrolled in overdraft protection were the direct cause of his harm, and plaintiff hasn't even alleged that he relied on any representation made by the bank. There's no allegation that he read the deposit agreement or the website pages that were identified for the first time in the second amended complaint. So the district court had it right. There were no affirmative misrepresentations that would be likely to deceive a reasonable consumer. There was no causation. There is no CLRA claim because the bank deposit accounts and overdraft protection and the extension of credit that it provides are not a service under the CLRA, and the court also appropriately decided the matter on a motion to dismiss on 12b-6, as has been affirmed by this circuit at least three times in the cases that we cited to the court. How do people enroll in this program? When you sign up for your bank account, one of the things that you are offered is whether or not to enroll in overdraft protection. How much does that cost? There is no fee for signing up for it. There's no fee? There's no fee. But how about you pay any fees, monthly fees? The only fee, no, you do not pay any fees whatsoever for the overdraft protection. The only fees that come into play are those that are in the deposit agreement, such as a cash advance fee if you're linked to a credit card account and they draw down funds from the credit card. But those fees are disclosed in the deposit agreement or in your credit card agreement, too. So does everyone get the benefit? All the depositors automatically get the benefit of this? Only if they choose to enroll and if they either link a savings account, a line of credit, or a credit card. They have to link it. Yes, you have to choose the program and you have to link it to some account that will provide the backup protection. But do they know, are they told if you link it to your credit card you're going to be charged the fees that are set forth for use of that credit card? Yes, Your Honor. The deposit agreement and the credit card agreement  Thank you, Your Honor. Okay, thank you. You want to say something in rebuttal? Yes, Your Honor, if I may. You've got 35 seconds left. Actually, he was, I think, 13 minutes over. Huh? He was 13 minutes over. Oh, no, that was... May I make one quick comment? She'll give you... You give him a minute of your time. Sure. He's your depositor. Thank you. There are just two general points I want to make. Many of the questions from Your Honor were pertaining to what's the evidence, what's in the record. I think that just underscores why it's inappropriate. There's no record here, really, because we've had absolutely no discovery. This case has been decided as a matter of law and a motion to dismiss. Well, the question is whether or not the statements are misleading. And you set the statements out in your complaint and we're being asked to determine whether they are reasonably likely to deceive. I mean, that's a question of law, isn't it? Well, so, for instance, one of the questions that you asked was whether or not, if he did not have this overdraft protection, would he have had these funds made available to him? And that's a question which seems that if the answer was no, this money would not be available to him until it actually cleared, would lead the court to think, or at least lead some people to think, that, okay, well, it's not actually giving you any type of protection. The name itself would be misleading because it's not offering protection. But that's something that hasn't been developed because we have had no... Counsel, just because we ask the question doesn't mean it's dispositive of the legal issue that we have to decide. Part of it has to do with making sure that we understand what you believe to be the case underlying your complaint. But the question that we have to resolve as I read the mandate of our prior panel and the issue that the district court addressed was whether or not these statements amount to material misrepresentations or false statements that would be reasonably likely to deceive a consumer. And I think you can start with the name itself, overdraft protection. This practice, this procedure that's different, as alleged in the complaint, actually puts the consumer at a greater risk of overdrawing on their account because they are giving money that's not real money. I think the insurance... This was my second point. My learned colleague used the example. This is like insurance. That is correct. It's like insurance, but if you blindfold the driver, you're actually increasing the risk of accident here. You're actually increasing the risk of overdraft here because you are treating the person differently. And in a sense, you're blindfolding them from the information. If Mr. Lumina had known that that money was not real money, they'd treat him like a normal consumer that didn't have the OPP. He would not... That protection, that word itself, is misleading, and he would not have suffered any of this damage and injury. I think we've got your arguments well in hand. Yeah. Thank you, Your Honors. Thank you very much. Yeah, I... It's a... A blindfolded driver. But you know they have new equipment now. You can actually be a blindfolded driver. My client would like to know if you'd like to hear from him. It's not, you know... I can answer the legal question. Exactly, you've been asking that. I can tell you... I know it's not... I know. Oh, we've got other cases on the calendar that we need to say. No. I love New York. I love New Yorkers. But we don't do this here. We've got a lawyer. He spoke well. And I hate to say no, but maybe the next time. Thank you, Your Honor. Thank you. Thank you, Counsel. Remember the song, Don't say no, say maybe. Okay.
judges: Pregerson, Tallman, Nguyen